Cite as 2024 Ark. 71

# SUPREME COURT OF ARKANSAS
**No.** CR–23–574

|  |  |
|---|---|
| DARYL JASON SCARBROUGH<br><br>APPELLANT<br><br>V.<br><br>STATE OF ARKANSAS<br><br>APPELLEE | **Opinion Delivered:** May 2, 2024<br><br>APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT<br>[NO. 60CR-21-4137]<br><br>HONORABLE CATHLEEN V. COMPTON, JUDGE<br><br><br>AFFIRMED. |

**JOHN DAN KEMP, Chief Justice**

Appellant Daryl Jason Scarbrough appeals a Pulaski County Circuit Court order convicting him of capital murder and aggravated robbery and sentencing him to a term of life imprisonment with a consecutive term of forty-years' imprisonment, respectively. For reversal, Scarbrough argues that the circuit court erred in granting the State's motions for continuance, denying his motion for continuance, denying his motion to suppress, permitting alleged prejudicial remarks by the prosecutor, and admitting a map into evidence. We affirm.

## I. *Facts*

Because Scarbrough does not challenge the sufficiency of the evidence, we provide only a recitation of the facts relevant to the arguments on appeal. *See Williams v. State*, 2024 Ark. 7, at 1, 682 S.W.3d 313, 315. On September 8, 2021, Scarbrough knocked on the front door of Sharon Dawson's home in Hensley. When Dawson answered the door,

Scarbrough said that he had been mowing and asked if he could get a drink of water from the water hose. Dawson grew suspicious when she saw no lawn equipment and asked for his name. Scarbrough became angry and began to cuss at her, and she asked him to leave. As he walked toward Ivy Chapel Road, Dawson called her partner, David Dunn; recounted what had happened; and told him that she was upset. Dunn, who worked nearby, told her that he would come home. Dawson then called 911 and reported the encounter. Afterward, she called her daughter and heard several gunshots. Dawson called 911 again and reported the gunshots. Meanwhile, as Terrence Reed was driving down Ivy Chapel Road, he saw a man lying in the street. Reed stopped, called 911, witnessed the man gasp his last breath, and stayed until police arrived at the scene. There, Deputy Bruce Scott found Dunn, who had been shot six times, including a shot to the back of his head, lying face-down in the middle of the road. Scarbrough fled the scene in Dunn's red truck, which contained Dunn's cell phone. Unbeknownst to Detective Scott at the time, his dashboard camera captured Dunn's truck being driven away from the scene at 6:39 p.m. as he drove toward it. Police later found Dunn's truck abandoned in the woods approximately seven miles from where Dunn's body was found.

After a two-day search, law enforcement located Scarbrough hiding in a flower bed on property belonging to homeowners on Highline Road. When the officers pulled him out of the flower bed, Scarbrough stated, "You guys are pretty rough on a hitchhiker out here, huh?" Scarbrough had active outstanding full-extradition warrants from Missouri and California, and the police arrested him on an active parole-absconder warrant.

Detective Jeff Allison of the Pulaski County Sheriff's Office transported Scarbrough to the Pulaski County jail and escorted him to an interview room, which was monitored on closed-circuit television. Detective Allison instructed him to take off his civilian clothing, put it in an evidence bag, and put on jail clothing. The detective stepped out of the interview room and watched the closed-caption television as Scarbrough changed clothes. According to the detective, Scarbrough took off his jeans, "held them up and looked at them from front to back and from the waist to the ankles and shook his head and then folded them like he was trying to maybe hide something." The detective retrieved the jeans, saw "stains that [he] believed to be blood," secured and sealed them, and sent them to the crime lab for DNA testing.

The State charged Scarbrough with capital murder and aggravated robbery and later nolle prossed felon-in-possession and habitual-offender allegations. It amended its felony information to include one count of capital murder, one count of possession of firearms by certain persons, and one count of aggravated robbery.

Prior to trial, on March 30, 2022, Scarbrough filed a motion to suppress evidence of DNA evidence obtained from the blood on his jeans, arguing that he was objecting not to the seizure of the jeans but, specifically, to the blood testing. He claimed that "police collected the evidence and had it examined without a search warrant"; that there was no exception to the warrant requirement; and that his arrest "was not legal."

The State responded to Scarbrough's motion to suppress and asserted that Scarbrough was arrested on active outstanding full-extradition warrants from Missouri for new charges committed in Missouri and from California for absconding his parole. The State asserted

3

that Scarbrough was lawfully arrested pursuant to those active warrants and pursuant to Rule 4.1 of the Arkansas Rules of Criminal Procedure. It stated that the clothes seized from Scarbrough at the time of his arrest were seized pursuant to Arkansas Rule of Criminal Procedure 12.1 involving a search incident to arrest and Arkansas Rule of Criminal Procedure 12.6 involving the taking of property pursuant to an arrest.

On April 20, 2022, the State filed a motion for continuance, stating that it had sent numerous pieces of evidence to the Arkansas State Crime Laboratory ("the crime lab") but that the crime lab's caseload was backlogged, and it had not yet completed testing on DNA and ballistics. The State contended that it had been diligent in seeking the test results and that DNA and ballistics testing was material to the State's case. On April 28, the circuit court conducted a hearing during which the State represented that "[i]n this case there was a lot of DNA" and that "DNA swabs are still out for testing." The State reminded the circuit court that "the crime lab ha[d] been very, very backed up" and that the DNA and ballistics were "both crucial to the State's case." Defense counsel objected and argued that Scarbrough had been continuously in custody and that DNA evidence would not "necessarily change the outcome of the case one way or the other[.]" The circuit court granted the State's motion for continuance.

On April 29, 2022, the State filed a motion for Scarbrough's saliva samples, pursuant to Rule 18.1(a)(vii) of the Arkansas Rules of Criminal Procedure, to be used for DNA analysis. In its motion, the State averred that the crime lab had determined that the blood on Scarbrough's jeans matched the victim's DNA and that of an unknown male. The State stated that the crime lab requested a "known DNA sample" from Scarbrough to compare

4

to the unknown sample found on the jeans and from swabs taken from the victim's truck. The circuit court granted the State's motion for a DNA sample pursuant to Rule 18.1(a)(vii) and, alternatively, ruled that the California search waiver executed by Scarbrough when he was released on parole "would separately authorize such sample." The crime lab later determined that Dunn's blood was on the right leg of Scarbrough's jeans.

On October 3, 2022, the circuit court conducted an omnibus hearing on Scarbrough's motion to suppress. Detective Allison testified that Missouri police had contacted him and relayed that Scarbrough had committed armed home invasions in Missouri and had stolen a car. Detective Allison also received information from California police that Scarbrough had committed numerous invasions and robberies in California and had absconded on parole. Detective Allison confirmed that Scarbrough had an active warrant for his arrest in San Bernardino County in California. According to the detective, as a condition of his parole in California, Scarbrough had signed a search waiver approximately five months before Dunn's murder. Detective Allison testified that he collected Scarbrough's jeans when he was arrested because he could not wear civilian clothing in jail. According to the detective, Scarbrough closely examined his jeans when he took them off, and the detective noticed blood on those jeans and submitted them to the crime lab for DNA testing. At the close of the hearing, Scarbrough argued that his arrest was not lawful and that the police should have obtained a warrant to seize his personal property and conduct DNA testing, particularly when he was arrested on a warrant from California and not for Dunn's murder. The State responded that Scarbrough was lawfully arrested; that the jeans were lawfully searched and seized pursuant to Rule 12.1 as a search

5

incidental to arrest; and that the officers had a valid California search waiver on file and were authorized to search pursuant to Arkansas Code Annotated section 16-93-106 (Supp. 2023). On October 14, the circuit court entered an order denying Scarbrough's motion to suppress the blood evidence. Specifically, the circuit court made the following findings of fact and conclusions of law:

> 11. Defendant was wearing a pair of jeans with blood that were taken as evidence by police. Numerous witnesses described the jeans. DNA swabs were taken from both the jeans and the victim's truck, which was left in the woods less than a mile from where the defendant was later found and arrested.
>
> . . . .
>
> 15. Second, Defendant filed a Motion to Suppress Physical Evidence of Blood on Defendant's Pants. Defendant argued that he was objecting not to the seizure of the pants, but specifically to testing the blood on them. Defendant claims that there was not probable cause to arrest the Defendant, regardless of the California Parole absconder warrant and mirroring search waiver with California.
>
> 16. The State counters that Arkansas Rules of Criminal Procedure 4.1 and 4.2 govern here and under both circumstances—whether with a warrant or without—the Defendant was lawfully arrested and detained, and the search and seizure of his clothing was proper.
>
> 17. Moreover, the waiver on file from California mirrors the Arkansas waiver, found at Arkansas Code Annotated section 16-93-106, and is in effect here. Specifically, this allows law enforcement to conduct a warrantless search of the parolee's "person, place of residence, or motor vehicle at any time, day or night, whenever requested by certified law enforcement officer . . . ." Pursuant to Ark. Code Ann. § 16-93-106(a)(2): "[a] warrantless search that is based on a waiver required by this section shall be conducted in a reasonable manner but does not need to be based on an articulable suspicion that the person is committing or has committed a criminal offense."
>
> 18. This Court finds that the seizure and testing of the blood on Defendant's pants was authorized under the California Search Warrant, which is effective in Arkansas. This Court also finds the arrest and search and seizure proper under both ARCP 4.1 and 4.2.

(Footnotes omitted.)

Subsequently, on November 15, 2022, the State informed the circuit court that Detective Allison had been injured in an accident that would require surgery, and he would not be available for the scheduled jury-trial dates. As a result, the State requested a continuance because it considered Allison a key witness who would establish the chain-of-custody evidence in its case. Scarbrough objected. The circuit court granted the State's second motion for continuance.

The case proceeded to a jury trial on January 10–13, 2023. During opening statements, the prosecutor twice made reference to Scarbrough as a "homicidal hitchhiker." After the second time, Scarbrough objected and moved for a mistrial. The prosecutor responded that her intent was not to inflame the jury but to describe the evidence that would be presented at trial. The circuit court denied Scarbrough's motion for mistrial. Then Scarbrough asked the circuit court to admonish the jury about the prosecutor's remarks. The circuit court denied his request but did admonish the jury that opening statements by counsel were not considered evidence.

At trial, AT&T legal-department employee Julio Melendez testified that AT&T received exigent phone-data ping requests from Sergeant Jeff King of the Pulaski County Sheriff's Office requesting cell-phone-ping data on Dunn's cell phone. According to Melendez, that location data, which included longitude and latitude coordinates, was collected and emailed to investigators shortly after the murder. During Melendez's testimony, State's exhibit 10, which contained AT&T's email notifications of those pings on September 9, 2021, was received into evidence. On cross-examination, Melendez

7

testified that the accuracy of the ping data and its longitude and latitude location was approximately 90 percent.

Detective Allison also testified at trial. He stated affirmatively that he had made a request to AT&T for the exigent phone data in an effort to locate Dunn's truck. He testified that he plotted the location data from AT&T onto a map using the longitude and latitude data from pings of Dunn's cell phone. The map also included locations where various witnesses had seen Scarbrough during the investigatory search. State's exhibit 11A showed a wider view of the area, while State's exhibit 11B depicted a closer view of the same area. Scarbrough objected to the admissibility of the map because, he claimed, it was inaccurate and prejudicial. The circuit court overruled Scarbrough's objection and ruled that the map would be admitted into evidence because it presented cumulative evidence of the AT&T evidence already admitted during Melendez's testimony.

During his testimony, Detective Allison stated that he found and collected a Ring video from a nearby house approximately a quarter of a mile from the scene that was helpful in his investigation. The State sought to introduce State's exhibits 8A and 8B that depicted still photographs from the Ring video of Dunn's and witness Zachery Ramsey's trucks turning onto Ivy Chapel Road. Scarbrough objected and argued that Detective Allison could not authenticate the time stamps on the photographs because he was not the keeper of Ring records. The State responded that Detective Allison verified the accuracy of the time stamps when he collected them. The circuit court overruled Scarbrough's objection and allowed the admissibility of the exhibits. Scarbrough then moved for a continuance to subpoena a Ring employee to authenticate the evidence because "we have no way of

8

knowing who put the time stamp on there." The State asserted that defense counsel had the Ring doorbell evidence for months and could have subpoenaed a Ring employee during those months prior to trial. The circuit court denied Scarbrough's motion for continuance.

Ultimately, on January 13, 2023, the jury found Scarbrough guilty of capital murder and aggravated robbery. The circuit court entered an amended sentencing order sentencing Scarbrough to life imprisonment on the capital-murder offense plus a consecutive forty-year term for aggravated robbery. The possession-of-firearms-by-certain-persons charge was nolle prossed. Scarbrough filed a timely notice of appeal.

## II. *Motions for Continuance*

For the first point on appeal, Scarbrough argues that the circuit court abused its discretion by granting the State's motions for continuance and denying his own motion for continuance. Specifically, he contends that the circuit court should not have granted the continuance (1) to allow the crime lab to complete its DNA and ballistics testing after he had long awaited trial since his arrest; and (2) to allow for the testimony of Detective Allison who was unavailable for trial. He also asserts that the circuit court abused its discretion in denying his own motion for continuance because he needed a continuance to authenticate evidence from the Ring video.

A circuit court shall grant a continuance only upon a showing of good cause and only for as long as is necessary, taking into account not only the request or consent of the prosecuting attorney or defense counsel, but also the public interest in prompt disposition of the case. Ark. R. Crim. P. 27.3. The standard of review for alleged error resulting from the denial of a motion for continuance is abuse of discretion. *Nelson v. State*, 2024 Ark. 24,

9

at 21, 683 S.W.3d 177, 194. Absent a showing of prejudice by the defendant, we will not reverse the decision of the circuit court. *Green v. State*, 2012 Ark. 19, at 3, 386 S.W.3d 413, 415. When a motion to continue is based on a lack of time to prepare, we will consider the totality of the circumstances. *Id.*, 386 S.W.3d at 415.

We agree that the circuit court properly granted the State's two motions for continuance. First, with regard to the DNA and ballistics testing, we agree with the circuit court that the State was diligent in submitting its evidence for crime-lab testing but was unable to obtain results because of the crime lab's backlog. This testing proved to be crucial for the State's case. Second, with regard to Detective Allison's unavailability, we agree with the circuit court that Allison's testimony was important since he was the lead investigator in the case. Notably, the State acted with diligence in moving for a continuance shortly after learning about the detective's injury. In both instances, Scarbrough has failed to demonstrate that the circuit court's rulings to grant the State's continuances resulted in any prejudice to him. Thus, we conclude that the circuit court properly granted these motions for continuance.

Scarbrough also contends that the circuit court abused its discretion in denying his motion to continue at trial because he should have had the opportunity to subpoena a Ring employee to authenticate the time stamps on State's exhibits 8A and 8B, which were the photographs of Dunn's and Ramsey's trucks taken from the Ring video.

With the foregoing precedent in mind, we agree with the circuit court's denial of Scarbrough's motion to continue. First, he waited until the third day of trial to object to State's exhibits 8A and 8B, notwithstanding his having knowledge of these exhibits for

10

months prior to trial. This displays a lack of diligence on his part and constitutes a sufficient basis to deny a motion for continuance. *See McCauley v. State*, 2023 Ark. 68, at 6, 663 S.W.3d 383, 387. Next, the "authentication or identification as a condition precedent to admissibility is satisfied" by the "[t]estimony of a witness with knowledge that a matter is what it is claimed to be." Ark. R. Evid. 901(a)–(b)(1). Here, Detective Allison testified that State's exhibits 8A and 8B depicted what he had actually viewed on the Ring video. Given this testimony, we conclude that the authentication requirement of Rule 901(b)(1) is satisfied. Accordingly, we hold that the circuit court did not abuse its discretion in denying Scarbrough's motion for continuance.

### III. *Motion to Suppress*

For the second point on appeal, Scarbrough argues that the circuit court erred in denying his motion to suppress blood evidence on his jeans and "specifically contends that while the seizure of his pants might be allowed, the testing of the pants would not be permitted without a warrant or order from the Court."

The State responds by presenting a twofold argument for affirming the circuit court's rulings. First, citing *United States v. Edwards*, 415 U.S. 800, 802–03 (1974), the State contends that "[a]t the time Scarbrough was arrested, and his jeans were seized and searched, he was suspected of Dunn's murder[,]" and as an arrestee, his clothes were lawfully seized incident to his arrest and were thereby "subject[] to laboratory analysis[.]" *Edwards*, 415 U.S. at 804. Next, the State asserts that Scarbrough was a parolee from California, and as a condition of his parole and pursuant to a signed parole waiver in California, he had consented to the search and seizure of his person and property by any law enforcement

officer. Citing *Edwards*, 415 U.S. 800, Scarbrough emphasizes in his reply brief that he was arrested to serve a parole warrant—not for Dunn's murder—and that the circuit court "used the California parole waiver as a basis for allowing the testing of [his] clothes" and should have obtained a warrant for the DNA testing.

In reviewing a circuit court's denial of a motion to suppress, we conduct a de novo review based on the totality of the circumstances, reviewing findings of historical fact for clear error and determining whether those facts give rise to reasonable suspicion or probable cause, giving due weight to inferences drawn by the circuit court and proper deference to the circuit court's findings. *Yarbrough v. State*, 370 Ark. 31, 36, 257 S.W.3d 50, 55 (2007). Arkansas appellate courts defer to the superior position of the circuit court to evaluate the credibility of witnesses at a suppression hearing. *Ilo v. State*, 350 Ark. 138, 147, 85 S.W.3d 542, 547 (2002). We will reverse the denial of a motion to suppress only if the ruling is clearly against the preponderance of the evidence. *Id.*, 85 S.W.3d at 547.

A law enforcement officer may arrest a person without a warrant if "the officer has reasonable cause to believe that such person has committed a felony[.]" Ark. R. Crim. P. 4.1(a)(1). The Fourth Amendment to the United States Constitution prohibits a warrantless arrest without probable cause. *Bishop v. State*, 2023 Ark. 150, at 7, 675 S.W.3d 869, 875. Probable cause to arrest *without* a warrant exists when the facts and circumstances within the collective knowledge of the officers and of which they have reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested. *Id.*, 675 S.W.3d at 875. The assessment of probable cause is based on the officers' knowledge at the moment

12

of the arrest. *Id.* at 8, 675 S.W.3d at 875. The determination of probable cause is also measured by the facts of each particular case. *Id.*, 675 S.W.3d at 875.

An officer who makes a lawful arrest of a suspect is authorized to search the person of the arrestee to look not only for weapons but also for the fruits and instrumentalities of the crime. *Heritage v. State*, 326 Ark. 839, 845, 936 S.W.2d 499, 503 (1996). Even if the fruits and instrumentalities of any other crime are found, those are properly seized. *Holmes v. State*, 262 Ark. 683, 688, 561 S.W.2d 56, 58 (1978). This court has stated that a search of an individual's personal effects is incidental to an arrest if it is conducted shortly thereafter at a jail. *Parris v. State*, 270 Ark. 269, 271–72, 604 S.W.2d 582, 583–84 (1980) (holding that "matches from [Parris's] purse were properly seized and could be used as evidence") (citing *Edwards*, 415 U.S. 800). *See also* Ark. R. Crim. P. 12.2 (permissible scope of search of the person in custody); Ark. R. Crim. P. 12.6 (custodial taking of property pursuant to arrest); *Oles v. State*, 993 S.W.2d 103, 110–11 (Tex. Ct. Crim. App. 1999) (holding that "there is virtually no evidence that [Oles] harbored a subjective expectation of privacy in his clothing that was in the custody of the police, nor is there evidence that society would deem such a belief reasonable under these circumstances").

Here, we agree with the circuit court's rulings based on both Arkansas law and the California search waiver. First, the record reveals that, after Scarbrough's arrest, Detective Allison requested that Scarbrough remove his jeans in a custodial-interview room, became suspicious when Scarbrough thoroughly inspected them, noticed stains on the jeans that appeared to be blood, and sent those jeans for laboratory testing. Although Scarbrough had been arrested to serve a parole warrant, Detective Allison was authorized to seize his jeans

because he was simultaneously under investigation for Dunn's murder. *See Holmes*, 262 Ark. at 688, 561 S.W.2d at 58. Thus, either as a search incidental to the arrest, or as an inventory, only a short time after his arrest, Scarbrough's jeans were properly seized and could be tested and used as evidence. *See Parris*, 270 Ark. at 272, 604 S.W.2d at 584.

Next, as a California parolee who had signed a search waiver as a condition to his release, Scarbrough was subject to a warrantless search. *See Samson v. California*, 547 U.S. 843, 847–57 (2006); *McFerrin v. State*, 344 Ark. 671, 678–79, 42 S.W.3d 529, 534–35 (2001). Further, pursuant to Arkansas Code Annotated section 16-93-106(a)(2), a "warrantless search that is based on a waiver required by this section shall be conducted in a reasonable manner but does not need to be based on an articulable suspicion that the person is committing or has committed a criminal offense." In light of section 16-93-106(a)(2), we agree with the circuit court in this instance that "the waiver on file from California mirrors the Arkansas waiver, found at Arkansas Code Annotated section 16-93-106, and is in effect here." Thus, the foregoing analysis of both rulings leads us to conclude that the circuit court's denial of Scarbrough's motion to suppress the blood evidence was not clearly against the preponderance of the evidence.

IV. *Prosecutorial Remarks*

For the third point on appeal, Scarbrough argues that the circuit court committed prejudicial error by allowing prejudicial remarks by the prosecutor in the State's opening statement. Specifically, Scarbrough contends that calling him a "homicidal hitchhiker" amounts to a "flagrant and highly prejudicial" remark on which the jury would base its

verdict. He further asserts that the circuit court "committed prejudicial error when it failed to admonish the jury to disregard the comment."

The law is well settled that to preserve an issue on appeal, a defendant must object at the first opportunity. *Duck v. State*, 2018 Ark. 267, at 9, 555 S.W.3d 872, 877; *Chunestudy v. State*, 2012 Ark. 222, at 9, 408 S.W.3d 55, 61. He also must renew his objection each time the issue is raised. *Duck*, 2018 Ark. 267, at 9, 555 S.W.3d at 877. Otherwise, he has waived his argument regarding that issue on appeal. *Id.*, 555 S.W.3d at 877.

In the case at bar, the prosecutor in the opening statement twice referred to Scarbrough as a "homicidal hitchhiker" during the following colloquy at trial:

| THE COURT: | All right. Is the State ready to make opening statements? |
| MS. MARIANI: | Yes, ma'am. |
| THE COURT: | Go ahead. |
| MS. MARIANI: | On September 8, 2021, David Dunn was brutally murdered by a homicidal hitchhiker who shot him six times, stole his truck and his trailer, and left him dead in the middle of the road with his brains splattered near the yellow, center line. |
| | What ensued after that was a 48-hour manhunt for that man right there, the Defendant, and it ended with a police tracking dog finally picking up his scent and finding him hiding in an elderly woman's garden[.] |
| | . . . . |
| | And finally, he couldn't get rid of David's blood on him. Now, it isn't just David's blood that screams for you to find this man guilty. David's blood on the Defendant is the centerpiece of the puzzle, so you have to listen to all of the evidence. And you're going to get another piece of evidence and another piece of evidence and another piece of evidence, and it starts building a |

15

picture and a picture and a picture until you see that picture clearly. And that picture is that that man right there—the man sitting right here—is that homicidal hitchhiker that brutally murdered David Dunn.

MR. PROCTOR:        We object. We just – Your Honor, may we approach?

. . . .

THE COURT:        All right. The motion for a mistrial is denied. If you can fashion an instruction that you want me to give to the jury, I will give it. Naturally, I'm going to be telling them opening statements are not evidence.

Having reviewed the foregoing colloquy, we conclude that the issue is not preserved. Here, Scarbrough failed to object at the first opportunity after the prosecutor's first reference to "homicidal hitchhiker." Rather, it was not until after the prosecutor's second reference toward the end of her opening statement that defense counsel objected. Because Scarbrough did not object at the first opportunity, we conclude that his argument is not preserved for our appellate review.

## V. *Evidentiary Ruling*

For the final point on appeal, Scarbrough argues that the circuit court abused its discretion by allowing into evidence a map made by AT&T that showed the location of cell-phone pings made from Dunn's cell phone shortly after his murder. Scarbrough contends that the circuit court committed prejudicial error because he considered this map of the ping locations to be inaccurate.

Challenges to the admissibility of evidence are left to the sound discretion of the circuit court, and a judge's ruling on these matters will not be reversed absent an abuse of discretion. *Neal v. State*, 2024 Ark. 16, at 12–13, 682 S.W.3d 672, 680. Abuse of discretion

16

is a high threshold that does not simply require error in the circuit court's decision but requires that the circuit court acted improvidently, thoughtlessly, or without due consideration. *Id.* at 13, 682 S.W.3d at 680. This court has stated that evidence that is merely cumulative or repetitious of other evidence admitted without objection cannot be claimed to be prejudicial. *Conte v. State*, 2015 Ark. 220, at 30, 463 S.W.3d 686, 704.

Here, Scarbrough has failed to demonstrate that the circuit court abused its discretion by admitting the map into evidence because the map was cumulative to State's exhibit 10 admitted at trial through Melendez's testimony. Thus, based on our well-established standard of review, we hold that the circuit court did not abuse its discretion by admitting the map into evidence, and we affirm this point.

## VI. *Rule 4-3(a)*

Because Scarbrough received a sentence of life imprisonment, the record has been reviewed for all errors prejudicial to him, as required by Arkansas Supreme Court Rule 4-3(a). No reversible error was found.

Affirmed.

BAKER and HUDSON, JJ., concur.

**KAREN R. BAKER, Justice, concurring.** I agree with the majority's disposition; however, I write separately because I cannot agree with the majority's holding that Scarbrough failed to preserve his argument regarding prejudicial remarks made by the prosecutor during the State's opening statement. Instead, I would hold that his argument is preserved, and I would consider the merits of his argument on appeal.

I recognize our general rule that to preserve an issue for appeal, a defendant must object at the first opportunity. *Duck v. State*, 2018 Ark. 267, 555 S.W.3d 872. However, under the unique facts of this case, this was the first opportunity for Scarbrough to object to the prosecutor's continued use of the phrase "homicidal hitchhiker" during opening statements. This is distinct from other situations this court has addressed in the context of opening statements in which the defendant objects to an alleged prejudicial statement only after the close of opening statements. The majority cites *Chunestudy v. State*, 2012 Ark. 222, 408 S.W.3d 55, which in turn relies on *Smith v. State*, 330 Ark. 50, 953 S.W.2d 870 (1997). In *Smith*, Smith argued that the prosecutor's remarks violated his rights to remain silent and not be compelled to be a witness against himself. However, we declined to reach the merits of his argument because Smith failed to make a contemporaneous objection. In declining to reach Smith's argument, we noted that in order to be timely, an objection must be contemporaneous, or nearly so, with the alleged error. *Smith*, 330 Ark. at 53, 953 S.W.2d at 871. To preserve a point for appeal, a proper objection must be asserted at the first opportunity after the matter to which objection has been made occurs. *Id.* We explained that the prosecutor's comments were made in the middle of the State's opening statement. However, Smith did not object when the statements were made; instead, he waited until the prosecutor had concluded his entire opening statement before bringing the alleged error to the circuit court's attention. We held that it was not erroneous for the circuit court to deny the untimely motion.

Unlike Smith, however, Scarbrough did not wait until the close of the State's opening statement to object. Instead, Scarbrough immediately objected to the prosecutor's

second reference to him as a "homicidal hitchhiker." Stated differently, this was Scarbrough's first opportunity to object to the prosecutor's repeated use of the phrase. Thus, under these circumstances, I would hold that Scarbrough's argument is preserved for our review, and I would reach the merits.

We now turn to Scarbrough's argument on appeal. He asserts that the circuit court committed prejudicial error when it allowed the prosecutor in the State's opening statement to refer to him as a "homicidal hitchhiker." Scarbrough argues that the prosecutor's statement "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)). The State argues that to constitute a due-process violation, the prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." *United States v. Bagley*, 473 U.S. 667, 676 (1985) (quoting *United States v. Agurs*, 427 U.S. 97, 108 (1976)). Further, circuit courts have wide discretion in the supervision of trials before them, including matters pertaining to opening statements, and this court will not reverse absent a manifest abuse of discretion. *Petty v. State*, 245 Ark. 808, 810, 434 S.W.2d 602, 603 (1968). "While the State should not appeal to prejudices, pervert the testimony, or make statements that cannot be proven during opening, 'it is not uncommon for an attorney to outline in an opening statement what he or she anticipates the testimony is going to be[.]'" *Reid v. State*, 2019 Ark. 363, at 6, 588 S.W.3d 725, 731 (quoting *Henry v. State*, 337 Ark. 310, 319, 989 S.W.2d 894, 898 (1999)). When evidence is admissible, a party may refer to it during opening statement. *Id.*, 588 S.W.3d at 731.

19

When the prosecutor referred to Scarbrough as a "homicidal hitchhiker" for the second time, Scarbrough objected and asked the circuit court to admonish the jury. As the State points out, the prosecutor responded that the proof at trial would show that Scarbrough murdered Dunn and was hitchhiking at the time of the murder. The circuit court declined to admonish the jury to disregard the remark and noted that in light of the proof it believed would be presented at trial, it did not believe that the prosecutor's remark was inappropriate. However, the circuit court did admonish the jury that opening statements are not evidence and that "remarks of attorneys having no basis in the evidence should be disregarded[.]"

Here, when Scarbrough was arrested, he referred to himself as a hitchhiker. Additionally, multiple witnesses testified that they saw a man matching Scarbrough's description hitchhiking along the road, and the State introduced evidence that Scarbrough had murdered Dunn. Thus, the prosecutor's reference to Scarbrough as a "homicidal hitchhiker" was in line with the evidence presented at trial. Given these facts, I cannot say that the prosecutor's remarks infected Scarbrough's trial with unfairness, nor can I say that the circuit court abused its discretion. Therefore, I concur with the majority's decision to affirm Scarbrough's convictions and sentences on direct appeal.

**COURTNEY RAE HUDSON, Justice, concurring.** I agree with the majority that the denial of Scarbrough's motion to suppress should be affirmed; however, I do not believe that we need to evaluate whether the DNA was properly obtained from Scarbrough's pants during the search incident to arrest because law enforcement clearly had the authority to

20

collect blood evidence from Scarbrough's pants pursuant to the search waiver that he had signed.

*Willard Proctor, Jr., P.A.*, by: *Willard Proctor, Jr.*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Jacob H. Jones*, Ass't Att'y Gen., for appellee.